**Hearing Date: June 10, 2019 at 2:00 p.m. (prevailing Eastern Time)**
**Deadline for Objections: June 3, 2019 at 4:00 p.m. (prevailing Eastern Time)**

AKIN GUMP STRAUSS HAUER & FELD LLP
Michael S. Stamer
Abid Qureshi
Meredith A. Lahaie
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
mstamer@akingump.com
aqureshi@akingump.com
mlahaie@akingump.com

*Counsel to the Ad Hoc Group*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | ) Chapter 11 |
| | ) |
| NEW COTAI HOLDINGS, LLC, *et al.*, | ) Case No. 19-22911 (RDD) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |
| | ) |
| | ) |

**NOTICE OF HEARING ON THE MOTION OF THE AD HOC GROUP TO**
**TERMINATE THE DEBTORS' EXCLUSIVITY PERIOD**

---

[1] The debtors (the "Debtors") in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: New Cotai Holdings, LLC (3056); New Cotai, LLC (2582); New Cotai Capital Corp. (3641); and New Cotai Ventures, LLC (9385). The Debtors' corporate address is c/o New Cotai, LLC, Two Greenwich Plaza, Greenwich, Connecticut 06830.

PLEASE TAKE NOTICE that on May 24, 2019 the ad hoc group (the "Ad Hoc Group") of certain unaffiliated holders of the Debtors' 10.625% Senior Pay-In-Kind Notes due 2019, filed a motion for entry of an order terminating the Debtors' exclusivity period to file and solicit acceptances of a plan of reorganization, pursuant to section 1121 of title 11 of the United States Code (the "**Motion**").

PLEASE TAKE FURTHER NOTICE that a hearing to consider the Motion will be held before the Honorable Robert D. Drain, United States Bankruptcy Judge in the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601-4140, on **June 10, 2019, at 2:00 p.m (prevailing Eastern Time)**.

PLEASE TAKE FURTHER NOTICE that responses or objections, if any, to the Motion must be made in writing, and (a) filed with the Bankruptcy Court no later than **4:00 p.m. (prevailing Eastern Time) on June 3, 2019** (the "Objection Deadline") and (b) served in the manner set forth in the Case Management Procedures annexed as Exhibit 1 to the May 10, 2019 Order Granting Debtors' Motion for Order Authorizing the Establishment of Certain Notice, Case Management, and Administrative Procedures [ECF No. 30].

PLEASE TAKE FURTHER NOTICE that unless a written objection to the Motion, with proof of service, is filed with the Bankruptcy Court and a courtesy copy delivered to the Honorable Robert D. Drain's chambers by the Objection Deadline, the Ad Hoc Group may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order attached to the Motion, which order may be entered with no further notice or opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in the chapter 11 cases are available free of charge by visiting https://cases.primeclerk.com/newcotai or by calling (844) 627-7471 (toll free from the U.S. and Canada); or (347) 292-3990 (international) or by e-mail at newcotaiinfo@primeclerk.com.  You may also obtain copies of any pleadings by visiting the Court's website at https://ecf.nysb.uscourts.gov.  Note that a PACER password is needed to access documents on the Court's website.

Dated:  New York, New York
       May 24, 2019

                    AKIN GUMP STRAUSS HAUER & FELD LLP

By:    */s/ Abid Qureshi*
       Michael S. Stamer
       Abid Qureshi
       Meredith A. Lahaie
       One Bryant Park
       New York, NY 10036
       Telephone: (212) 872-1000
       Facsimile: (212) 872-1002
       mstamer@akingump.com
       aqureshi@akingump.com
       mlahaie@akingump.com

       *Counsel to the Ad Hoc Group*

**Hearing Date: June 10, 2019 at 2:00 p.m. (prevailing Eastern Time)**
**Deadline for Objections: June 3, 2019 at 4:00 p.m. (prevailing Eastern Time)**

AKIN GUMP STRAUSS HAUER & FELD LLP
Michael S. Stamer
Abid Qureshi
Meredith A. Lahaie
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
mstamer@akingump.com
aqureshi@akingump.com
mlahaie@akingump.com

*Counsel to the Ad Hoc Group*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 11 |
| NEW COTAI HOLDINGS, LLC, *et al.*, | Case No. 19-22911 (RDD) |
| Debtors.[1] | (Jointly Administered) |

**MOTION OF THE AD HOC GROUP TO TERMINATE THE**
**DEBTORS' EXCLUSIVITY PERIOD**

---

[1] The debtors (the "Debtors") in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: New Cotai Holdings, LLC (3056); New Cotai, LLC (2582); New Cotai Capital Corp. (3641); and New Cotai Ventures, LLC (9385). The Debtors' corporate address is c/o New Cotai, LLC, Two Greenwich Plaza, Greenwich, Connecticut 06830.

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................1

JURISDICTION AND VENUE ..................................................................3

BACKGROUND .........................................................................................4
    A.    General Background on the Debtors..........................................4
    B.    The Restructuring and Offering................................................5
    C.    The Debtors' Refusal to Engage with the Ad Hoc Group ..................7

RELIEF REQUESTED ...............................................................................10

ARGUMENT...............................................................................................10
    I.    Cause Exists to Terminate the Debtors' Exclusivity Period............10
        a.    The Inquiry is Case Specific and Rests in the Court's Discretion ..................................................................10
        b.    The Debtors' Inability to Propose a Confirmable Plan Constitutes Cause to Terminate the Exclusivity Period .....................12
        c.    The Remaining Factors Also Weigh in Favor of Terminating the Exclusivity Period ................................................17
    II.    The Debtors Will Not Be Prejudiced By Termination of the Exclusivity Period ..................................................................20

NOTICE.......................................................................................................21

NO PRIOR REQUEST...............................................................................21

CONCLUSION ...........................................................................................21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
    352 B.R. 578 (Bankr. S.D.N.Y. 2006) .............................................................................11, 12

*Matter of All Seasons Industries, Inc.*,
    121 B.R. 1002 (Bankr. N.D. Ind. 1990) ...........................................................................15, 16

*In re AMF Marina Ltd, d/b/a Snapper Marina*,
    No. 10-25822-CED (Bankr. M.D. Fla.) ................................................................................16

*In re Ampal Am. Isr. Corp.*,
    No. 12-13689-smb (Bankr. S.D.N.Y.) .............................................................................16, 19

*In re BH Sutton Mezz, LLC*,
    No. 16-10455-shl (Bankr. S.D.N.Y.) .................................................................15, 17–18, 19

*In re Bishop Gorman Dev. Corp.*,
    No. 17-11942 (Bankr. D. Nev.) ...........................................................................................18

*Bunch v. Hoffinger Indus., Inc. (In re Hoffinger Indus., Inc.)*,
    292 B.R. 639 (B.A.P. 8th Cir. 2003) ....................................................................................12

*In re Creditwest Corp.*,
    No. 10-11212 (Bankr. N.D. Ca.) ..........................................................................................16

*In re Crescent Beach Inn, Inc.*,
    22 B.R. 155 (Bankr. D. Me. 1982) .......................................................................................16

*In re Curry Corp.*,
    148 B.R. 754 (Bankr. S.D.N.Y. 1992) ..................................................................................20

*In re DN Assocs.*,
    144 B.R. 195 (Bankr. D. Me. 1992) .....................................................................................14

*In re Gagel & Gagel*,
    24 B.R. 674 (Bankr. S.D. Ohio 1982) ..................................................................................15

*In re Gibson & Cushman Dredging Corp.*,
    101 B.R. 405 (E.D.N.Y. 1989) .................................................................................10–11, 16

*In re GMG Capital Partners III, L.P.*,
    503 B.R. 596 (Bankr. S.D.N.Y. 2014) .................................................................11–12, 13, 20

*In re Grossinger's Assocs.*,
   116 B.R. 34 (Bankr. S.D.N.Y. 1990) ...........................................................................15, 21

*In re HWA Props., Inc.*,
   No. 14-11774-fmd (Bankr. M.D. Fla.) ................................................................................16

*In re Lefkara Grp. LLC*,
   No. 12-11702-smb (Bankr. S.D.N.Y.) ................................................................................16

*In re Mother Hubbard, Inc.*,
   152 B.R. 189 (Bankr. W.D. Mich. 1993) ......................................................................20–21

*In re Pub. Serv. Co. of New Hampshire*,
   99 B.R. 155 (Bankr. D.N.H. 1989) .....................................................................................15

*In re R.G. Pharmacy, Inc.*,
   374 B.R. 484 (Bankr. D. Conn. 2007) ................................................................................15

*In re Team Ventana, LLC*,
   No. 14-17915-EPB (Bankr. D. Ariz.) ..................................................................................16

*In re Tex. Extrusion Corp.*,
   844 F.2d 1142 (5th Cir. 1988) ............................................................................................18

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood
   Forest Assocs., Ltd.)*,
   808 F.2d 363 (5th Cir. 1987), *aff'd*, 484 U.S. 365 (1988) ................................................11

**Statutes**

11 U.S.C. § 1107(a) ...................................................................................................................4

11 U.S.C. § 1108 .......................................................................................................................4

11 U.S.C. § 1121 .............................................................................................................3, 10, 25

11 U.S.C. § 1129(a) .................................................................................................................13

28 U.S.C. § 157 .....................................................................................................................3, 24

28 U.S.C. § 1334 ...................................................................................................................3, 24

28 U.S.C. § 1408 .......................................................................................................................3

28 U.S.C. § 1409 .......................................................................................................................3

**Other Authorities**

FED. R. BANKR. P. 1015(b) ........................................................................................................4

The ad hoc group (the "Ad Hoc Group") of certain unaffiliated holders of the Debtors'

10.625% Senior Pay-In-Kind Notes due 2019 (the "Notes," and holders of such notes, the

"Noteholders") under that certain indenture dated as of April 19, 2013 (as subsequently

amended, restated, modified, or supplemented from time to time, the "Indenture"), by and

through its undersigned counsel, hereby submits this motion (the "Motion") pursuant to section

1121 of title 11 of the United States Code (the "Bankruptcy Code") for entry of an order

terminating the Debtors' exclusivity period to file and solicit acceptances of a plan of

reorganization, and any such further relief as may be just and necessary under the circumstances.

In support of this Motion, the Ad Hoc Group respectfully states as follows:

## PRELIMINARY STATEMENT

1.      By the Motion, the Ad Hoc Group asks the Court to terminate the Debtors'

exclusivity period.  The Ad Hoc Group does not seek such a remedy lightly, and recognizes that

the relief requested is rarely sought so early in a chapter 11 proceeding.  These chapter 11 cases,

however, present the rare circumstances where terminating a debtor's exclusivity period is both

warranted and appropriate.  These circumstances are addressed in more detail below.

2.      The Debtors comprise a series of holding companies controlled by Silver Point

Capital, L.P. ("Silver Point").  They have no employees and no operations; they are simply shells

that hold a minority equity investment in a Macau-based casino, Studio City (as defined herein).

The Debtors' only significant liability is the indebtedness underlying the Notes, of which the Ad

Hoc Group holds more than 70% (or, upon information and belief, approximately 97% when

insider holdings are excluded).

3.      Despite the best efforts of the Ad Hoc Group to negotiate a consensual

restructuring—efforts that preceded these cases by many months and have continued following

1

the Petition Date[2]—the Debtors have not engaged to date in any meaningful way.  The extent of

the interactions between the parties is easily and quickly summarized.  After months of overtures

and requests for information and documentation from the Ad Hoc Group since it became

apparent that the Debtors would not be able to pay the Notes on maturity, two Silver Point

representatives finally agreed to meet with certain members of the Ad Hoc Group in mid-April

2019.  Based on both the substance of that brief meeting held on the eve of maturity and the term

sheet received from them immediately thereafter, it was clear that Silver Point's strategy with

respect to a restructuring of the Debtors was to try to play out an out-of-the-money option for as

long as possible with the hope that the Debtors' interests in Studio City might increase in value

as a result of events that might or might not occur in the future.  The Ad Hoc Group, of course,

was (and is) simply not willing to gamble its recoveries on events that might potentially play out

years from now, and thus found Silver Point's approach untenable.  Rather than disengage from

the discussions, the Ad Hoc Group instead responded promptly with a counter-proposal that

outlined the terms of a potential plan of reorganization.

        4.      Notwithstanding the Ad Hoc Group's repeated requests for a formal or informal

response to its term sheet, the Debtors have provided no response and no guidance as to the

potential substance of any such response, even on an advisors-eyes-only basis.  In addition, a call

did take place this week between the Debtors' advisors and the Ad Hoc Group's advisors, and the

parties anticipate that their respective principals will speak next week.  The Ad Hoc Group has

been and remains ready and willing to participate in such meetings or calls in good faith, but

based on the tenor of this week's call and the Debtors' conduct to date is not optimistic that a

---

[2] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the
Declaration of John Brecker in Support of Chapter 11 Petitions and First Day Pleadings.  Brecker Decl., May 1,
2019, ECF No. 11.

consensual resolution can be reached.  Accordingly, the Ad Hoc Group made the determination

to file this Motion to seek authority to prosecute a confirmable plan of reorganization that will

maximize the value of the Debtors' only asset and minimize cost and delay.

5.      There is no viable plan of reorganization that the Debtors can propose without the

Ad Hoc Group's support given that the Ad Hoc Group holds more than two-thirds of all claims.

Under these circumstances, termination of the Debtors' exclusivity period is appropriate to

enable the Ad Hoc Group to propose a confirmable plan of reorganization on an expedited

timeline, a plan that the Ad Hoc Group would propose to fund through an extremely competitive

DIP loan.  Indeed, and as evidence of the Ad Hoc Group's good faith and commitment to these

cases, the Ad Hoc Group has now submitted to the Debtors a formal proposal to provide DIP

financing commensurate with the Debtors' stated needs, utilizing the documentation prepared in

connection with the proposed Silver Point facility but improving on Silver Point's proposed

economics.  Moreover, the Ad Hoc Group's proposed DIP facility would provide sufficient

liquidity to satisfy all trade claims in full and in cash.  Under these facts and circumstances, the

Ad Hoc Group submits that the relief requested in the Motion should be granted.

## JURISDICTION AND VENUE

6.      The United States Bankruptcy Court for the Southern District of New York (the

"Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is

a core proceeding within the meaning of 28 U.S.C. § 157(b).

7.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The statutory basis for the relief requested in this Motion is section 1121(d) of the

Bankruptcy Code.

3

# BACKGROUND

### A.  General Background on the Debtors

9.      On May 1, 2019 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

10.      Pursuant to Bankruptcy Code sections 1107(a) and 1108, the Debtors have remained in possession of their assets.  No trustee or examiner has been appointed, nor has any request for such appointment been made, and the United States Trustee has not formed an unsecured creditors' committee.

11.      The Debtors are affiliated holding companies that were formed for the sole purpose of holding a minority equity investment in what is now known as Studio City International Holdings Limited ("Studio City") which, together with its subsidiaries, owns an integrated entertainment, retail, hotel, and gaming resort located in Macau, China.  Brecker Decl. ¶¶ 10, 12, 14.  The Debtors' only meaningful asset is their interest in Studio City.  *Id.* ¶ 11.  They have no employees, no business operations, and no material assets other than the minority equity position in Studio City.  *Id.*

12.      The Debtors' only prepetition funded debt obligations are the Notes.  *Id.* ¶ 23. Debtors New Cotai, LLC and New Cotai Capital Corp. are the issuers of the Notes, and Debtor New Cotai Holdings, LLC is the guarantor of the obligations under the Indenture and the Notes. *Id.* ¶¶ 21–22.  As of the Petition Date, the outstanding principal amount of Notes, inclusive of interest paid-in-kind that has been added to the principal balance, is currently $856 million.  *Id.* ¶ 23.  The PIK Notes matured on May 1, 2019.  *Id.* ¶ 22.

13.     The Debtors have no significant debt other than the approximately $856 million due under the Notes.  The Debtors' list of top 20 unsecured creditors indicates that the next largest unsecured creditor after the Indenture Trustee for the Notes holds a claim of approximately $127,500, and that the total amount of the Debtors' unsecured debt other than the Notes is less than $300,000 in the aggregate.[3]  Collectively, the Ad Hoc Group holds approximately 70% of the Notes outstanding under the Indenture or, upon information and belief, approximately 97% if insider Silver Point's holdings are excluded.  *See* Stamer Decl. ¶ 5. Accordingly, the Ad Hoc Group holds in excess of 70% of all claims against the Debtors.

14.     The Debtors are, and at all relevant times have been, indirectly controlled by Silver Point.  Brecker Decl. ¶¶ 10–11.  Silver Point also holds Notes in addition to its indirect equity stake in the Debtors.  *See* Stamer Decl. ¶ 6.

**B.  The Restructuring and Offering**

15.     In July 2018, the Debtors contacted the Noteholders to solicit their consent to amend the Indenture in order to "help facilitate the potential Studio City IPO."  *See* Stamer Decl. ¶ 7.  The Debtors provided no salient information about the potential offering, and misleadingly explained that the proposed amendment "would allow Studio City to put into place a new structure related to the Studio City IPO that is tax efficient and complies with regulatory requirements, and *would make New Cotai no worse off* than Studio City's current structure."  *Id.* (emphasis added).  Presumably relying on such statements, a requisite number of Noteholders approved the amendment, and the Indenture was amended as of August 16, 2018.  *Id.* ¶ 8.

16.     Prior to the offering, the Debtors reported in their consolidated financial statements that the value of their investment in Studio City was sufficient to cover the

---

[3] *See, e.g.*, New Cotai, LLC Voluntary Petition for Non-Individuals Filing for Bankruptcy, May 1, 2019, ECF No. 1. Additionally, the Debtors' twentieth largest creditor has a claim of only $45.72.

outstanding balance on the Notes. *Id.* ¶ 9. Thus, the information made available to the Noteholders prior to the Offering substantiated their belief that the Debtors would be able to repay the Notes in full, in cash, at their maturity on May 1, 2019.

17.     Studio City completed the purportedly "public" offering in October 2018 (the "Offering"). *See* Brecker Decl. ¶ 13. Approximately 89% of the 28.75 million American Depositary Shares ("ADSs") offered in the Offering[4] went to Silver Point and Studio City's other largest shareholder, Melco Resorts & Entertainment Limited ("Melco"). *Id.*[5] None of the ADSs were allocated to the Debtors. *Id*. ¶ 15. Further, Silver Point and Melco received these ADSs at a discounted price of $12.50 per share. *Id.* ¶ 13. During the first three days of trading, the price of the ADSs rose to $18.50. *See* Simms Decl. ¶ 3. The ADS price peaked at $28.59 during November, and traded at $18.23 as of the Petition Date. *Id.* ¶¶ 3–4.[6]

18.     The Debtors assert that prior to the Offering, the underwriters had determined that a successful offering would "require . . . the direct or indirect shareholders of Studio City" to buy shares, and advised that it "would be preferable to have affiliates of both Melco and New Cotai, LLC provide the support." Brecker Decl. ¶ 15. Despite its ability to control the Debtors unilaterally as the Debtors' controlling shareholder, Silver Point took no action to enable the Debtors to participate in the Offering. Instead, Silver Point elected to participate in the Offering

---

[4] In November 2018, the Offering's underwriters exercised their overallotment option in full and received an additional 4.3 million ADSs. *See* Brecker Decl. ¶ 13.

[5] *See also* Prospectus for 28,750,000 American Depositary Shares, Studio City Int'l Holdings Ltd (Oct. 17, 2018), https://www.sec.gov/Archives/edgar/data/1713334/000119312518301560/d552298d424b4.htm (noting that Melco, through its subsidiary, was allocated 15,330,000 ADSs (53.3% of the total amount of ADSs offered in the Offering, prior to the overallotment ), and certain affiliates of New Cotai (*i.e.*, Silver Point) were allocated 10,220,000 ADSs (35.5% of the total amount of ADSs offered in the Offering)).

[6] In connection with these events, Studio City also entered into a new shareholders agreement and governing documents which, in conjunction with the Offering, reduced the Debtors' representation on the Studio City board from 1 of 3 (or 2 of 5) directors pre-Offering, to 2 of 11 directors after the Offering. *See* Brecker Decl. ¶ 20; Shareholders' Agreement, MCE Cotai Invs. Ltd., available at https://www.sec.gov/Archives/edgar/data/0001713334/000119312518269188/d552298dex417.htm (last visited May 24, 2019).

through its other affiliates, thereby siphoning value away from the Debtors for its own benefit.
*Id.* ¶ 16.  Indeed, based on publicly available information, Silver Point appears to have profited
substantially on account of its participation in the Offering.

19.    The Offering had an immediate and devastating effect on the Debtors and the
Noteholders.  The Debtors' interest in Studio City was cut almost in half, from 40% to 23%.  *Id.*
¶¶ 14, 17.  Likewise, the Notes, which had been trading at 96% of Par Value immediately before
the Offering was commenced, were trading at only approximately 52% of Par Value less than
two weeks later.  *See* Simms Decl. ¶¶ 5–6.

20.    Following the Offering, the trading value of New Cotai's shares in Studio City,
which trade on the New York Stock Exchange, never exceeded $520 million.[7]  On the Petition
Date, the trading value of New Cotai's shares in Studio City was approximately $330 million,[8]
less than half of the $856 million due under the Notes.  Thus, according to the historical trading
price of Studio City's shares, Silver Point's equity interests in New Cotai have been out of the
money by hundreds of millions of dollars at all times after the completion of the Offering.

**C.  The Debtors' Refusal to Engage with the Ad Hoc Group**

21.    The Noteholders quickly understood that the Offering had seriously jeopardized
the Debtors' ability to repay the Notes at their maturity on May 1, 2019.  Accordingly, the
Noteholders promptly formed the Ad Hoc Group, and immediately thereafter attempted to
commence productive discussions with the Debtors and Silver Point, which efforts were largely

---

[7] According to the public markets, the maximum value of New Cotai's shares in Studio City was approximately
$518 million, which is calculated by multiplying (i) the peak market value of the ADS following the Offering (*i.e.*,
$28.59) by (ii) the approximately 18.1 million ADS that New Cotai holds based on the 23.07% percentage
ownership figure disclosed in the Brecker Declaration.  *See* Brecker Decl. ¶ 17; Simms Decl. ¶ 3.

[8] This value is calculated in the same manner as set forth above using the market value of the ADS on the Petition
Date (*i.e.*, $18.23).  *See* Simms Decl. ¶ 4.

rebuffed.  Stamer Decl. ¶¶ 10–22.  The Ad Hoc Group's attempts to engage substantively on a

solution, and the Debtors' rejection of those efforts, included the following:

- **November 9, 2018**: The Ad Hoc Group sent a letter to the Debtors seeking information and documentation concerning the Offering and requesting that the parties commence discussions concerning the upcoming maturity of the Notes.  *See id.* ¶ 11.

- **November 19, 2018**: The Debtors responded with a letter laying out their general position on certain matters but failing to provide the requested documentation or to commence discussions with the Ad Hoc Group.  *See id.* ¶ 12.

- **December 13, 2018**: The Ad Hoc Group sent the Debtors an additional letter requesting that the Debtors provide access to basic and readily-accessible organizational documents relevant to the Offering.  *See id.* ¶ 13.  The Debtors did not provide any documents in response to this or any other request.  *See id.*

- **December 18, 2018**: The Debtors requested that the Ad Hoc Group disclose the identity of its members and stated, among other things, that they "look[ed] forward to working constructively with the [Ad Hoc Group] with respect to the maturity of the Notes" at "the appropriate time." *See id.* ¶ 14.

- **January 3, 2019**: The Ad Hoc Group identified the members of the Ad Hoc Group and again asked the Debtors to provide documents relevant to the Offering. *See id.* ¶ 15. Further, the Ad Hoc Group indicated that it was prepared to engage immediately in discussions to address the upcoming maturity even if the Debtors continued to refuse to provide any of the information requested by the Ad Hoc Group.  *See id.*  The Debtors never responded to the January 3 letter.  *See id.*

- **March 26, 2019**: The Ad Hoc Group sent a follow-up letter urging the Debtors to engage in discussions given that the maturity was less than six weeks away.  *See id.* ¶ 16.  The Debtors never responded to the March 26 letter.  *See id.*

- **March 29, 2019**: In an email response to a missed call from counsel to the Ad Hoc Group, counsel to the Debtors stated that they would contact the Ad Hoc Group as soon as there was "something substantive to discuss."  *See id.* ¶ 17.

- **April 11, 2019**: Two representatives of Silver Point finally agreed to meet with two members of the Ad Hoc Group at a principals-only meeting in New York City.  *See id.* ¶ 18.

- **April 24, 2019**: The members of the Ad Hoc Group signed confidentiality agreements in order to receive a proposal from the Debtors addressing the impending maturity.  The Debtors sent a term sheet that included their proposal, following the April 11, 2019 principals' meeting (the "April Term Sheet").  *See id.* ¶ 19.

8

- **April 26, 2019**: The Ad Hoc Group sent the Debtors a counterproposal outlining the terms of a consensual restructuring through a chapter 11 plan of reorganization (the "<u>Ad Hoc Proposal</u>"). *See id.* ¶ 20.  The Debtors never responded to the Ad Hoc Group's proposal. *See id.*

- **April 30, 2019**: The Ad Hoc Group sent the Debtors a letter indicating that, to the extent the Debtors were contemplating a chapter 11 filing, the Ad Hoc Group would be willing to provide the Debtors with DIP financing. *See id.* ¶ 21.  Again, the Debtors did not respond. *See id.*

- **May 1, 2019**: The Debtors commenced these chapter 11 cases in the Southern District of New York without providing the Ad Hoc Group with any advance notice. *See id.* ¶ 22.

22.     The Debtors have similarly failed to engage meaningfully with the Ad Hoc Group in the weeks following the Petition Date.  Indeed, despite multiple requests, the Debtors have not sent the Ad Hoc Group a written response to the Ad Hoc Proposal.  *See id.* ¶ 24.  The Debtors also have been unwilling or unable to confirm to the Ad Hoc Group that they will provide a counter to the Ad Hoc Proposal and have declined efforts to ascertain the general direction of any such proposal.  *See id.* ¶ 25.  The members of the Ad Hoc Group have been and will remain willing to participate in good faith in any meeting or call with the Debtors after the filing of this Motion.  Based on the Debtors' communications and conduct to date, however, the Ad Hoc Group believes that the parties are too far apart to reach a consensual resolution on a reasonable timeline, and sees no indication that the Debtors are contemplating a plan proposal which they would find acceptable.

23.     On the day of this filing and in order to move these cases forward on a value-maximizing path, the Ad Hoc Group submitted to the Debtors a DIP financing proposal that mirrors the financing proposal contemplated by Silver Point, with the following key distinctions: (1) the Ad Hoc Group proposal provides for an annual interest rate that is 0.50% lower than the Silver Point proposal; (2) the Ad Hoc Group proposal provides for a commitment fee that is

0.25% lower than the Silver Point proposal, and (3) the Ad Hoc Group proposal includes

sufficient additional liquidity to repay all the Debtors' trade creditors in full.  *See id.* ¶ 27.

## RELIEF REQUESTED

24.     By this Motion, the Ad Hoc Group seeks entry of an order terminating the

Debtors' exclusivity period to file and solicit acceptances of a plan of reorganization.  A

proposed form of order approving the relief requested herein is annexed hereto as Exhibit A.

## ARGUMENT

I.     **Cause Exists to Terminate the Debtors' Exclusivity Period**

a.     **The Inquiry is Case Specific and Rests in the Court's Discretion**

25.     Section 1121 of the Bankruptcy Code governs who may file a chapter 11 plan of

reorganization and when such plan may be filed.  11 U.S.C. § 1121.  It provides that a debtor has

the exclusive right to file a plan within the first 120 days after the order for relief and, if such

plan is filed, the debtor is given 180 days (running concurrently) in which to obtain acceptance

of the plan.  11 U.S.C. §§ 1121(b), (c).  This period of 120 days (or 180 days) is referred to in

this Motion as the "exclusivity period."

26.     The Bankruptcy Court "may for cause reduce or increase the 120-day period or

the 180-day period" upon the request of a party in interest and after notice and hearing.  11

U.S.C. § 1121(d)(1).  After the exclusivity period has passed, any "party in interest," including

the Ad Hoc Group, may file a plan.  11 U.S.C. § 1121(c).

27.     The Bankruptcy Code does not define what constitutes "cause" for purposes of

reducing or increasing the exclusivity period.  Rather, courts have recognized that the "cause"

standard allows bankruptcy courts "maximum flexibility to suit various types of reorganization

proceedings."  *In re Gibson & Cushman Dredging Corp.*, 101 B.R. 405, 409 (E.D.N.Y. 1989)

(noting Congress's reasons for enacting section 1121 include the intention to "cure the prior practice that gave debtors undue bargaining leverage to delay and thereby force a settlement out of otherwise unwilling creditors" (citations omitted)). Section 1121 is "a congressional acknowledgement that creditors, whose money is invested in the enterprise no less than the debtor's, have a right to a say in the future of that enterprise." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 372 (5th Cir. 1987) (noting that one of the fundamental purposes of Bankruptcy Code section 1121 is "to limit the delay that makes creditors the hostages of Chapter 11 debtors"), *aff'd*, 484 U.S. 365 (1988).

28.     The determination of "cause" to alter the exclusivity period is a case-by-case inquiry which rests within the sound discretion of the bankruptcy court. *See In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 586 (Bankr. S.D.N.Y. 2006).

29.     In order to determine whether such "cause" exists, courts in this circuit have identified a list of nine factors that are typically considered. These include: (1) the size and complexity of the case; (2) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (3) the existence of good faith progress toward reorganization; (4) the fact that the debtor is paying its bills as they become due; (5) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (6) whether the debtor has made progress in negotiations with its creditors; (7) the amount of time that has elapsed in the case; (8) whether the debtor is using exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (9) whether an unresolved contingency exists. *In re Adelphia Commc'ns Corp.*, 352 B.R. at 586–87; *see also In re GMG Capital*

*Partners III, L.P.*, 503 B.R. 596 (Bankr. S.D.N.Y. 2014) (applying factors to deny extension of exclusivity).

30.     Some of the enumerated factors may be more relevant or important than others based on the facts of each case, and it is not "simply a question of adding up the number of factors." *See Bunch v. Hoffinger Indus., Inc. (In re Hoffinger Indus., Inc.)*, 292 B.R. 639, 644 (B.A.P. 8th Cir. 2003).

31.     Ultimately, the "primary consideration" for a court in determining whether exclusivity should continue or terminate is whether termination "will move the case forward." *See In re Adelphia Commc'ns Corp.*, 352 B.R. at 590.   In other words, "the test is better expressed as determining whether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case.   Certainly practical considerations, or other considerations in the interest of justice, could override, in certain cases, the result after analysis of the nine factors." *Id.*

### b.   The Debtors' Inability to Propose a Confirmable Plan Constitutes Cause to Terminate the Exclusivity Period

32.     Here, consideration of the ***fifth*** factor clearly supports the Ad Hoc Group's position that exclusivity should be terminated, even at this early juncture.   The Debtors simply have no prospect of filing a viable plan without the support of the Ad Hoc Group and have made no indication that they intend to engage meaningfully with the Ad Hoc Group on the terms of a viable reorganization in order to secure such support.   The Ad Hoc Group holds more than 70% of all claims against the Debtors (or, upon information and belief, approximately 97% excluding insiders).   Without the Ad Hoc Group's support, the Debtors will not be able to satisfy the

impaired accepting class requirement set forth in Bankruptcy Code section 1129(a)(10).[9]  The Ad

Hoc Group will not, however, support the type of plan it expects the Debtors to file (several

months and several million dollars into these chapter 11 cases), which would render any such

plan unconfirmable as a matter of law.  The Debtors' inability to propose a viable, confirmable

plan, and unwillingness to date to engage in good faith on the terms of a restructuring that would

garner the support of the Ad Hoc Group, constitute cause to terminate the exclusivity period.

33.    This case is notably similar to a recent case before Judge Bernstein, *In re GMG*

*Capital Partners III, L.P.*  There, like here, the debtor was a non-operational entity whose sole

purpose was to hold a stock portfolio in certain technology companies.  503 B.R. 596.  The

GMG debtor moved to extend the exclusivity period, and its principal creditors objected.  Judge

Bernstein found that the question was essentially whether the GMG debtor "should be permitted

to impose its view of the future on [creditors] and any other party in interest by preventing them

from filing a plan that calls for a different exit strategy that may involve a quicker sale of the

portfolio."  *Id.*  Among other factors, Judge Bernstein considered the fact that the GMG debtor

had not demonstrated reasonable prospects for proposing a viable plan that its creditors would

support.  *Id.* at 602.  Judge Bernstein concluded that the case was fundamentally "a two party

dispute," with the debtors and creditors each having a different view of the future, and decided

that "[e]ach side should be able to file their own plan and let the other creditors, the market, and

if necessary, the Court, determine the value of the . . . stock in the context of a sale or a

confirmation hearing."  *Id.* at 603.

---

[9] The Bankruptcy Code requirements for plan confirmation include the requirement that "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).  As set forth above, the Ad Hoc Group's DIP proposal contemplates paying in full the less than $300,000 in total trade claims. Even if these trade claims remain outstanding, there is no basis to separately classify them.

34.     This is precisely the situation presented here, where the Debtors appear to be singularly focused on the speculative hope that Studio City will complete further developments by July 2021, which *may* enable the Debtors to repay the Notes in full in several years' time. Brecker Decl. ¶¶ 26–27; *see also* Hr'g Tr. 10–11, May 9, 2019 (Debtors' counsel explaining expectation that Notes may be able to be repaid if developments completed in 2021).  The Debtors' pre-petition April Term Sheet was similarly predicated on this speculative and unsubstantiated view.  *See* Stamer Decl. ¶ 19.  The Noteholders do not share the Debtors' singular focus, and in any event have no interest or incentive to wait patiently for several years while the Debtors gamble their existing recovery on a fractional interest in an unproven asset in a highly-regulated industry and continue to incur the significant costs attendant to these chapter 11 cases.  As such, the Debtors' proposal in the April Term Sheet is unacceptable to the Ad Hoc Group.  Since that time—both pre- and post-petition—the Debtors have shown no willingness to propose an alternative viable plan or to negotiate productively with the Ad Hoc Group; to the contrary, the Debtors failed to respond to the Ad Hoc Group's April 26, 2019 counterproposal and have failed to date to present a written proposal (or even directional guidance on the terms of a plan), as requested by the Ad Hoc Group.  *See* Stamer Decl. ¶¶ 23–25.   Likewise, professionals have spoken and failed to make any progress, and the Ad Hoc Group anticipates that the second meeting with principals will be similar to the first meeting, which was completely unsuccessful. *Id.* ¶ 26.

35.     Many courts have found "cause" to terminate, or refuse to extend, a debtor's exclusivity period where the debtor was unable or unlikely to propose a confirmable plan.  *See, e.g.*, *In re DN Assocs.*, 144 B.R. 195, 197 n.9 (Bankr. D. Me. 1992) (cause for terminating exclusivity within 180 day period included "the unlikely prospects for gaining acceptances by

14

significant creditor interests in the next 60 days, the questionable prospects for its confirmation

over creditor objections and the promise of a competing 100% plan"); *In re Grossinger's*

*Assocs.*, 116 B.R. 34, 36 (Bankr. S.D.N.Y. 1990) (exclusivity terminated where, *inter alia*, debtor

unable to file plan with "serious reorganizational possibilities" and court opined that creditors

"should not be required to await the outcome of an attempted restructuring of a nondebtor entity

before the debtor may expect to make efforts to fund a plan of reorganization."); *In re Gagel &*

*Gagel*, 24 B.R. 674, 675 (Bankr. S.D. Ohio 1982) (refusing to extend exclusivity period as

fruitless and counterproductive, given that no plan could be approved without the cooperation of

the objecting creditor); Transcript of Hearing at 17, *In re BH Sutton Mezz, LLC*, No. 16-10455-

shl (Bankr. S.D.N.Y. Sept. 15, 2016), ECF No. 267 (court finding creditor opposition to plan

weighed in favor of terminating debtors' exclusivity period); Order, *id.* (Sept. 28, 2016), ECF

No. 256 (order terminating exclusivity); *In re Pub. Serv. Co. of New Hampshire*, 99 B.R. 155,

175–76 (Bankr. D.N.H. 1989) (refusing to extend exclusivity, where, *inter alia*, parties had

reached a "stalemate" and "further extension of exclusivity [would] *not* promote a consensual

plan of reorganization within a reasonable timeframe") (emphasis in original); *In re R.G.*

*Pharmacy, Inc.*, 374 B.R. 484, 488 (Bankr. D. Conn. 2007) (refusing to extend exclusivity,

where, *inter alia*, exclusivity was not shown to be "likely to significantly improve the progress of

the case" and where the cited contingencies failed to show cause, "particularly in light of the

breakdown of negotiations between the parties"); *Matter of All Seasons Industries, Inc.*, 121 B.R.

1002, 1006 (Bankr. N.D. Ind. 1990) (refusing to extend exclusivity, where, *inter alia*, it was

unlikely that debtor and primary opponents would "be able to find a common ground upon which

to structure a mutually satisfactory plan" given their "good faith difference of opinion about the future prospects of debtor's business").[10]

36.    Courts have also recognized that a creditor's loss of confidence in a debtor is a relevant factor to consider, and that an acrimonious relationship between a debtor and its creditors can warrant terminating the exclusivity period. *Matter of All Seasons Indus., Inc.*, 121 B.R. at 1006 (refusing to extend exclusivity period where creditors had "lost faith in the capability and perhaps the integrity of debtor's management"); *In re Crescent Beach Inn, Inc.*, 22 B.R. 155, 160–61 (Bankr. D. Me. 1982) (finding that acrimonious relationship among principal parties and the seasonality of the debtor's business warranted reduction of exclusivity period). This is not a case in which the creditors have refused to negotiate in good faith. *Cf. In re Gibson*, 101 B.R. at 410 (extension of exclusivity affirmed, noting creditor recalcitrance and intent to liquidate rather than negotiate a plan of reorganization). To the contrary, the Ad Hoc Group attempted unsuccessfully for months to engage in a substantive negotiation with Silver Point

---

[10] *See also* Order, *In re Ampal Am. Isr. Corp.*, No. 12-13689-smb (Bankr. S.D.N.Y. Jan. 7, 2013), ECF No. 128 (order terminating exclusivity period within first 180 days; opposition withdrawn); Motion at 19-21, *id.* (Nov. 8, 2012), ECF No. 61 (movant arguing, *inter alia*, that debtor was a holding company, with no operational issues to be addressed through bankruptcy, debtor had failed to make any progress in eight months of negotiations with its creditors prior to the petition date, and debtor had failed to demonstrate that it would propose an alternative plan that its creditors would accept); Order, *In re Creditwest Corp.*, No. 10-11212 (Bankr. N.D. Ca. July 19, 2010), ECF No. 84 (order terminating exclusivity period within first 120 days); Motion at 2, *id.* (June 4, 2010), ECF No. 65 (movant arguing, *inter alia*, that it was "almost mathematically impossible for the debtor to confirm a Plan without the support of the unsecured creditors' committee"); Order, *In re Lefkara Grp. LLC*, No. 12-11702-smb (Bankr. S.D.N.Y. Sept. 4, 2012), ECF No. 22 (order terminating exclusivity period); Motion ¶ 16, *id.* (Aug. 3, 2012), ECF No. 12 (movant arguing, *inter alia*, that debtor had no way to confirm a plan of reorganization); Order, *In re HWA Props., Inc.*, No. 14-11774-fmd (Bankr. M.D. Fla. Sept. 17, 2015), ECF No. 194 (order terminating exclusivity period); Motion at 7, *id.* (Mar. 25, 2015), ECF No. 67 (movant arguing, *inter alia*, that debtor had "failed to demonstrate *any* reasonable prospect of filing a viable Chapter 11 plan" and that negotiations with the largest unsecured creditor and debtor had "not progressed in any meaningful way"); Order, *In re Team Ventana, LLC*, No. 14-17915-EPB (Bankr. D. Ariz. Apr. 1, 2015), ECF No. 59 (order terminating exclusivity period within first 120 days); Motion at 2, *id.* (Feb. 24, 2015), ECF No. 41 (movant arguing, *inter alia*, that debtor had "no definitive means of exiting bankruptcy," debtor "failed to negotiate with its creditors," and debtor appeared "incapable of presenting a viable plan of reorganization"); Order, *In re AMF Marina Ltd, d/b/a Snapper Marina*, No. 10-25822-CED (Bankr. M.D. Fla. Apr. 26, 2011), ECF No. 112 (order amending order terminating exclusivity period within first 180 days); Motion at 2, *id.* (Apr. 1, 2011), ECF No. 100 (movant arguing, *inter alia*, that debtor could not confirm plan without creditor's consent, which creditor would not provide).

prior to the commencement of these cases.  Post-petition efforts at achieving consensus have

been similarly unsuccessful.  Emails and a call with the Debtors' professionals to explore a

consensual resolution have all convinced the Ad Hoc Group that the Debtors are unwilling to

move in any significant way from the "extend the option" approach embodied in the April Term

Sheet.  The Ad Hoc Group thus sees no evidence that the Debtors intend to change course and

engage constructively with creditors now on the terms of a restructuring that would receive

sufficient support—indeed, all evidence supports the Ad Hoc Group's belief that the Debtors

intend to delay and deflect in the misguided and unsubstantiated hope that the trading value of

the Studio City stock will more than double and provide a mechanism to satisfy the Noteholders'

claims.

### c.  The Remaining Factors Also Weigh in Favor of Terminating the Exclusivity Period

37.    In addition to the fifth factor addressed above, consideration of the remaining

factors also support terminating the Debtors' exclusivity period, notwithstanding the early stage

of these cases.

38.    *__First__*, the size and complexity of these cases—or rather lack thereof—supports

terminating exclusivity.  The Debtors have no operational business, no employees, no leases to

assume or reject, and no major assets other than their investment in Studio City.  Brecker Decl. ¶

11, Ex. F.  Simply put, there is no operational business to be rehabilitated through these chapter

11 proceedings.  Nor is there any complexity to the Debtors' capital structure.  These cases

essentially are a two-party dispute between Silver Point and the Noteholders regarding the

appropriate distribution of the Debtors' interest in Studio City.  The first factor thus weighs in

favor of termination.  Transcript of Hearing at 13, *In re BH Sutton Mezz, LLC*, No. 16-10455-shl

(Bankr. S.D.N.Y. Sept. 15, 2016), ECF No. 267 (court finding termination of exclusivity

warranted where, although significant dollars were at stake, cases were not complex, involved single real estate development project, no employees, no operations, and no cash flow); Order, *id.* (Sept. 28, 2016), ECF No. 256 (order terminating exclusivity).

39.    ***Second***, while it is early in these chapter 11 cases, it is not early in the process commenced by the Ad Hoc Group in November 2018 to negotiate a consensual restructuring transaction.  Specifically, it has been apparent that the Debtors would not be able to satisfy the Notes upon their maturity and that a restructuring would be necessary since the completion of the Offering in October 2018.  In light of that fact, the Ad Hoc Group diligently sought to engage the Debtors promptly following the Offering, and even proposed a term sheet for a plan of reorganization prior to commencement of these cases.  Likewise, it appears that the Debtors have been preparing for this filing for many months as well.  *E.g.*, Brecker Decl. Ex. I (showing that the managers for New Cotai Ventures, LLC—the only Debtor that is a New York entity—were all appointed in October 2018).  Given the Ad Hoc Group's history of attempting to work with Silver Point to address the Debtors' irrefutable need to reorganize, and the many months that the Debtors have already had to negotiate a consensual restructuring with the Noteholders, the Ad Hoc Group submits that no further time is needed.  *In re Tex. Extrusion Corp.*, 844 F.2d 1142 (5th Cir. 1988) (affirming termination of exclusivity within initial 120 day period of debtor at issue where related cases had been pending and bankruptcy court had reasonably drawn inference that the purpose of filing was to delay creditors' efforts at reorganization); Transcript of Hearing at 45–46, *In re Bishop Gorman Dev. Corp.*, No. 17-11942 (Bankr. D. Nev. Mar. 21, 2018), ECF No. 407 (court terminating exclusivity period and noting, *inter alia*, that "[p]rior to the filing of the bankruptcy case, this debtor had ample time and opportunity to negotiate . . . to resolve this two-party payment dispute in a fair and responsible matter -- manner. Ultimately,

though, that did not happen outside of bankruptcy");[11] Motion at 19–21, *In re Ampal Am. Isr.*

*Corp.*, No, 12-13689-smb (Bankr. S.D.N.Y. Nov. 8, 2012), ECF No. 61 (noting debtor failed to

negotiate constructively pre-petition).  This factor also weighs in favor of termination.

40.    ***Third***, there has been no good faith progress toward reorganization.  As noted, the

Ad Hoc Group's repeated attempts to work constructively with the Debtors were ignored or

rejected for months prior to the Petition Date and have not progressed meaningfully following

the commencement of these cases.  Thus, this factor also weighs in favor of termination.

41.    ***Fourth***, the debtor's payment (or not) of bills as they become due has little

relevance to these cases given that the Debtors are only holding companies for a minority equity

investment in a non-debtor, and lack any operating business.  Transcript of Hearing at 15, *In re*

*BH Sutton Mezz, LLC*, No. 16-10455-shl (Bankr. S.D.N.Y. Sept. 15, 2016), ECF No. 267 (paying

bills "unextraordinary" where debtor lacked employees and operations).  Indeed, the DIP

Financing the Debtors intend to procure is necessary only to fund the administrative expenses—

almost entirely professional fees—associated with these cases, and appear to be destined for

Skadden and Houlihan Lokey, advisors who, upon information and belief, have close

relationships to Silver Point.  Allowing a debtor who is statutorily incapable of proposing a

confirmable plan of reorganization to benefit from an exclusivity period will necessarily prolong

these cases and result in increased administrative expenses, and thus this factor also weighs in

favor of termination.

42.    ***Sixth***, the Debtors have made no substantive progress in negotiations with their

creditors.  As noted, this failure is attributable to the Debtors' repeated refusal to engage with the

Ad Hoc Group in the months prior to the Petition Date (or to engage constructively in the weeks

---

[11] *See also id.* (court noting that there was "little hope" of a consensual plan of reorganization in the foreseeable future and that competing plans was the best option for bringing the matter to closure in an expedient way).

since), despite the Ad Hoc Group repeatedly and proactively seeking to do so.  Thus, this factor

also weighs in favor of terminating the exclusivity period.

43.     <u>**Seventh**</u>, while the cases were recently filed, the amount of time that has elapsed

does not undermine the need to terminate the exclusivity period under these circumstances, for

the reasons discussed in connection with the second and third factors.

44.     <u>**Eighth**</u>, the Debtors should not be permitted to use exclusivity in order to pressure

the Ad Hoc Group to accept an untenable plan, or to prevent the Ad Hoc Group from filing a plan

that could maximize value for stakeholders.  Exclusivity "should not be employed as a tactical

device to put pressure on creditors to yield to a plan that they might consider unsatisfactory."  *In

re Curry Corp.*, 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992).  Moreover, maintaining exclusivity

would effectively permit Silver Point—which for its own benefit diluted the value of the

Debtors' Studio City investment by taking the Offering allocation for itself—to retain control of

these estates, prolonging the proceedings and causing professional fees to mount, to the

detriment of all other stakeholders.

45.     <u>**Ninth**</u>, and lastly, there are no unresolved contingencies here.  Prolonging

exclusivity would inappropriately permit the Debtors "to park themselves in chapter 11 and hold

their creditors hostage unless or until things improve" in the Studio City project.  *In re GMG*,

503 B.R. at 603.

## II.      <u>The Debtors Will Not Be Prejudiced By Termination of the Exclusivity Period</u>

46.     The Debtors will not be prejudiced if the exclusivity period is terminated at this

juncture.  The Debtors will still be able to file any proposed plan that they wish, and such plan, if

filed, may proceed on a path that is parallel to any plan proposed by the Ad Hoc Group.  *See In

re Mother Hubbard, Inc.*, 152 B.R. 189, 195 (Bankr. W.D. Mich. 1993) (termination of

exclusivity is not prejudicial to the debtor because the debtor retains the ability to attempt to confirm its own plan of reorganization); *In re Grossinger's Assocs.*, 116 B.R. at 36 (termination of exclusivity does not foreclose debtor from proposing a plan, it only means that the right to propose a plan will not be exclusive with the debtor).  As such, permitting the Ad Hoc Group to file a proposed plan would move these cases towards resolution for the benefit of the Debtors' disinterested stakeholders.

## NOTICE

47.    Notice of this Motion shall be provided to: (a) Skadden, Arps, Slate, Meagher & Flom LLP as counsel to the Debtors; (b) the Office of the United States Trustee for the Southern District of New York; (c) the entities listed on the consolidated list of 20 largest unsecured creditors filed by the Debtors in these Chapter 11 Cases; (d) Milbank LLP as counsel to Silver Point; (e) the United States Attorney for the Southern District of New York; (f) the United States Securities and Exchange Commission; (g) the Internal Revenue Service; (h) parties on the 2002 List; and (i) any other such party entitled to notice pursuant to Local Bankruptcy Rule for the Southern District of New York 9013-1(b).  The Ad Hoc Group respectfully submits that no other notice is necessary or required.

## NO PRIOR REQUEST

48.    No prior request for the relief requested herein has been made to this or any other Court.

## CONCLUSION

For the foregoing reasons, the Ad Hoc Group respectfully requests that this Court enter an order terminating the Debtors' exclusivity period and permitting the Ad Hoc Group to

file and solicit acceptance of a proposed plan of reorganization, and granting such further relief

as may be just and necessary under the circumstances.

Dated:  New York, New York
        May 24, 2019

                                    AKIN GUMP STRAUSS HAUER & FELD LLP

                        By:     */s/ Abid Qureshi*
                                Michael S. Stamer
                                Abid Qureshi
                                Meredith A. Lahaie
                                One Bryant Park
                                New York, NY 10036
                                Telephone: (212) 872-1000
                                Facsimile: (212) 872-1002
                                mstamer@akingump.com
                                aqureshi@akingump.com
                                mlahaie@akingump.com

                                *Counsel to the Ad Hoc Group*

## <u>EXHIBIT A</u>

**Proposed Form of Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| *In re* | ) | Chapter 11 |
| | ) | |
| NEW COTAI HOLDINGS, LLC, *et al.*, | ) | Case No. 19-22911 (RDD) |
| | ) | |
| Debtors.[12] | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| | ) | |

## [PROPOSED] ORDER GRANTING THE MOTION OF THE AD HOC GROUP TO TERMINATE THE DEBTORS' EXCLUSIVITY PERIOD

Upon consideration of the motion (the "Motion") by the ad hoc group (the "Ad Hoc Group") of certain unaffiliated holders of the Debtors' 10.625% Senior Pay-In-Kind Notes due 2019 (the "Notes," and holders of such notes, the "Noteholders") under that certain indenture dated as of April 19, 2013 (as subsequently amended, restated, modified, or supplemented from time to time, the "Indenture"), for an order, pursuant to section 1121(d) of title 11 of the United States Code (the "Bankruptcy Code"), terminating the Debtors' exclusive plan filing and solicitation periods (the "Exclusivity Period"); this Court finds and concludes that the Court has jurisdiction over the subject matter of the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; this is a core proceeding pursuant to 28 U.S.C. § 157(b); the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; the relief requested in the Motion is in the best interests of the Debtors, their estates and their creditors; notice of the Motion

---

[12] The debtors (the "Debtors") in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: New Cotai Holdings, LLC (3056); New Cotai, LLC (2582); New Cotai Capital Corp. (3641); and New Cotai Ventures, LLC (9385).  The Debtors' corporate address is c/o New Cotai, LLC, Two Greenwich Plaza, Greenwich, Connecticut 06830.

1

was sufficient, and no other or further notice need be provided; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED** that:

1.    The Motion is granted to the extent set forth herein.

2.    Pursuant to Bankruptcy Code section 1121(d), the Debtors' Exclusivity Period is hereby terminated.  Any party in interest may file and solicit a plan of reorganization for the Debtors.

3.    The terms and conditions of this order shall be immediately effective and enforceable upon its entry.

4.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this order.

Dated: June ___, 2019
        White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE